Not for Publication

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civ. No. 19-16290 (ES) (JRA) |
| v. | OPINION |
| GERARD F. HUG and KURT W. STREAMS, | |
| Defendants. | |

SALAS, DISTRICT JUDGE

Before the Court is defendant Gerard F. Hug's motion to dismiss the complaint (D.E. No. 1 ("Compl." or "Complaint")) pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.E. No. 11 ("Motion")). Having considered the parties' submissions, the Court resolves the Motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons expressed herein, the Motion is GRANTED.

## I.        BACKGROUND & PROCEDURAL HISTORY[1]

### A.        The Parties

This is a civil enforcement action by the Securities and Exchange Commission ("SEC") against defendants Gerard F. Hug and Kurt W. Streams (together, ("Defendants")), former executives of SITO Mobile, Ltd. ("SITO"), for violations of federal securities laws. SITO is a Delaware company headquartered in Jersey City, New Jersey, that provides location-based

---

[1]        The Court draws all facts from the Complaint and certain Securities and Exchange Commission filings attached as exhibits to Hug's moving brief. (*See* D.E. No. 12 ("Def. Mov. Br.")); *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) ("[T]he SEC filings attached by a number of the defendants[] are matters of public record of which the court can take judicial notice.").

mobile data advertising services to its clients.  (Compl. ¶ 19).  Its common stock is registered with the SEC pursuant to Section 12(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78l, and its securities are traded on the NASDAQ Capital Market.  (*Id.*).  Hug, a New Jersey resident, joined SITO in 2011 and served as its Chief Executive Officer ("CEO") and director from August of 2014 until his resignation on February 17, 2017.  (*Id.* ¶ 17).  Streams, a Connecticut resident, served as SITO's Chief Financial Officer ("CFO") from November of 2013 until his resignation on March 10, 2017.  (*Id.* ¶ 18).  Streams contemporaneously served as SITO's Chief Operating Officer ("COO") from December of 2016 until his resignation.  (*Id.*).

From 2014 to 2016—a key period outlined in the Complaint—SITO had annual revenues of $9,871,558 (2014), $23,013,222 (2015), and $29,426,955 (2016), with annual operating expenses of $13,632,614 (2014), $19,422,023 (2015), and $30,858,652 (2016).  (D.E. No. 11-3, SITO's 2014 Form 10-K ("Def. Ex. B") at F-4; D.E. No. 11-5, SITO's 2015 Form 10-K ("Def. Ex. D") at F-6; D.E. No. 11-7, SITO's 2015 Form 10-KT ("Def. Ex. F") at F-5; D.E. No. 11-11, SITO's 2016 Form 10-K ("Def. Ex. J") at F-4).[2]  SITO is not a party to this action.  (*See generally* Compl.).

### B.   Defendants' Alleged Expense Abuses

According to the Complaint, from 2014 until their resignation in 2017, both Hug and Streams knowingly and improperly charged thousands of dollars of various personal and living expenses to SITO's business accounts.  (*Id.* ¶¶ 2 & 3).  Defendants allegedly coded the expenses as legitimate in SITO's accounting system to cover up their conduct.  (*Id.*).

---

[2]      Hug calculates SITO's annual operating expenses to be $25,779,639 for the year 2015, but it is not apparent how he arrived at this sum.  (*See* Def. Mov. Br. at 5).  SITO's 2015 Form 10-K, for the twelve months ending September 30, 2015, reports total operating expenses in the amount of $12,252,966.  (Def. Ex. D at F-6).  SITO's 2015 Form 10-KT, for the three months ending December 31, 2015, reports total operating expenses in the amount of $7,169,057.  (Def. Ex. F at F-5).  Together, these two sums equal $19,422,023.

### 1. Allegations Regarding Hug's Fraudulent Conduct

As to Hug, the SEC claims that from 2014 through early 2017, he regularly used SITO's corporate charge card to pay for more than $100,000 in personal expenses like "airfare for family trips, sporting tickets, designer clothes, and resort stays." (*Id.* ¶ 2). The SEC claims, by way of example, that Hug "improperly charged . . . over $7,000 to the SITO charge card account for his fiftieth birthday party and over $4,000 for his child's sixteenth birthday party," for which he then directed SITO's accounting department to record as business expenses. (*Id.* ¶ 22). When SITO's accounting personnel provided him with a spreadsheet detailing his SITO charge card usage so that he could identify the general ledger expense code for each charge, Hug repeatedly coded his personal charges as legitimate business expenses. (*Id.* ¶ 27).

### 2. Allegations Regarding Streams' Fraudulent Conduct

As to Streams, the SEC claims that from 2014 through early 2017, he used SITO's corporate charge card issued in his name, along with cash from SITO's corporate bank account, to pay for more than $200,000 in personal expenses like "personal meals, commuting costs, his Netflix and Amazon Prime subscriptions, pet groomers, eyewear, and vacations." (*Id.* ¶ 3). The SEC claims, by way of general example, that Streams made over eight hundred unauthorized personal charges in 2015—three hundred of which were made at businesses around his home in Connecticut—using SITO's corporate account "to cover daily living expenses that ranged in amount from $0.99 to $390" at places like "fast food restaurants, drug stores, liquor stores, grocery stores, convenience stores, eye wear providers, movie theaters, book stores, coffee shops, and gas stations." (*Id.* ¶ 23).[3]

---

[3]   The SEC further alleges, by way of example, that between April 15, 2016, and April 18, 2016, Streams took a personal trip to Punta Cana in the Dominican Republic and used SITO's corporate charge card to pay approximately $4,000 in trip expenses, including a limousine ride to the airport, $1,900 in lodging, and $1,200 in food and beverages. (*Id.* ¶ 24). When SITO's accounting personnel provided Streams with the monthly spreadsheet

C.     **False and Misleading SEC Filings and Representations to Auditors**

By mischaracterizing the true nature of their expenses in SITO's books and records, Defendants allegedly materially impacted five of SITO's SEC filings: its 2014 and 2015 proxy statements as well as annual reports on Forms 10-K for 2014, 2015, and the interim period in 2015 for which SITO filed a Form 10-KT when it switched to a calendar-end fiscal year.  (*Id.* ¶¶ 31–34).  Specifically, the SEC claims that Defendants caused SITO to omit from its 2014 and 2015 proxy statements the fact that it paid Defendants' personal expenses, thereby understating Defendants' executive compensation.  (*Id.* ¶ 31; *see* D.E. No. 11-4, SITO's 2015 Proxy Statement ("Def. Ex. C") at 19; D.E. No. 11-6, SITO's 2016 Proxy Statement ("Def. Ex. E") at 12).  While SITO's 2016 Form 10-K later reported, based on an independent investigation, that the allegedly misappropriated funds were nonetheless "properly expensed in the appropriate periods," (Def. Ex. J at 28), the SEC claims that Item 402 of Regulation S-K required SITO to disclose these payments as "other compensation" because they were personal benefits or perquisites (not in the form of salary or bonuses) awarded to, earned by, or paid to Defendants as named executive officers.  (Compl. ¶ 30).  SITO then allegedly used these inaccurate proxy statements to solicit annual shareholder votes to elect directors, including Hug, and to solicit shareholders' votes on executive compensation, including Defendants' 2015 and 2016 compensation.  (*Id.* ¶ 32).

The SEC further claims that these proxy statements compromise the veracity of the SEC filings in which they are subsumed—namely, SITO's 2014 and 2015 annual reports and Forms

---

detailing his SITO charge card usage so that he could identify the general ledger expense code for each charge, he repeatedly coded his personal charges as legitimate business expenses.  (*Id.* ¶ 25).  For instance, Streams allegedly recorded the expenses from his Punta Cana trip under the general ledger codes for "airfare/train," "auto/taxi expense," "meals," and "lodging," and failed to submit appropriate expense documentation to disguise the charges as legitimate business trip expenses.  (*Id.* ¶¶ 25 & 26).  Throughout the period of 2015 through 2017, and by virtue of his position as CFO, Streams allegedly was responsible for reviewing all employees' expenses charged to SITO's charge card account, making him the only SITO employee who reviewed the general ledger coding for his own expenses.  (*Id.* ¶ 28).

10-K, which "materially understate[] Defendants' compensation." (*Id.* ¶¶ 33 & 34). As SITO's CEO and CFO, respectively, Hug and Streams signed the annual reports and, according to the SEC, falsely certified that they were accurate and truthful despite knowing SITO improperly paid their personal expenses. (*Id.* ¶ 35). Defendants similarly certified to SITO's auditors, with respect to audits of the company's 2014 and 2015 financials, that they had no knowledge of "management fraud." (*Id.* ¶¶ 36 & 37).

Based on the foregoing, and following an investigation into Defendants' conduct, the SEC filed the instant Complaint asserting the following counts:

Count I:  as to both Defendants, fraud in connection with the purchase of securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5;

Count II:  as to both Defendants, fraud in connection with the offer or sale of securities, in violation of Section 17(a)(1) of the Securities Act of 1933 ("Securities Act");

Count III:  as to both Defendants, fraud in connection with the offer or sale of securities, in violation of Section 17(a)(3) of the Securities Act;

Count IV:  as to Hug, submission of false certifications under the Sarbanes-Oxley Act of 2002, in violation of Rule 13a-14 of the Exchange Act;

Count V:  as to Streams, submission of false certifications under the Sarbanes-Oxley Act of 2002, in violation of Rule 13a-14 of the Exchange Act;

Count VI:  as to both Defendants, lying to auditors and falsification of books and records, in violation of Section 13(b)(2)(A) of the Exchange Act and Rules 13b2-1 and 13b2-2 thereunder;

Count VII:  as to both Defendants, circumventing and failing to implement a system of accounting controls, in violation of Section 13(b)(5) of the Exchange Act;

Count VIII:  as to both Defendants, aiding and abetting SITO's violations of the reporting provisions of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder;

Count IX:  as to both Defendants, aiding and abetting SITO's violations of the books, records, and internal controls provisions of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act; and

Count X:  as to both Defendants, aiding and abetting SITO's violations of the proxy provisions of Section 14(a) of the Exchange Act and Rules 14a-3 and 14a-9 thereunder.[4]  (*Id.* ¶¶ 42–83).

The SEC seeks a permanent injunction, disgorgement, and civil penalties.  (*Id.* at 21–22).

In response to the Complaint, Streams filed an answer (D.E. No. 16), and Hug filed the instant motion to dismiss.  (Def. Mov. Br.).  The SEC opposed the Motion and Hug filed a reply. (D.E. No. 19 ("Pl. Opp. Br."); D.E. No. 20).  The oral argument set for the summer of 2020 was postponed.  (D.E. Nos. 44, 57, 60 & 73–74).  Meanwhile, the SEC and Hug engaged in months-long settlement discussions that ultimately proved to be unsuccessful.[5]  (*See* D.E. Nos. 53, 78, 81, 90 & 93 (noting, on June 7, 2021, that while the parties asked the Court "to refrain from deciding the pending [M]otion," settlement discussions "have not borne fruit")).  To that end, Hug's motion to dismiss is fully briefed and ripe for resolution.  (D.E. No. 93 (requesting that the Court "proceed to decide the [M]otion")).

## II.   STANDARDS OF REVIEW

### A.   Rule 12(b)(6) Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed, in whole or in part, for failure to state a claim upon which relief can be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

---

[4]      Between November 2018 and March 2019, Hug and Streams each executed two agreements with the SEC that tolled the running of any limitations period and preserved the timeliness of the SEC's claims as to all conduct alleged in the Complaint.  (Compl. ¶¶ 40 & 41).

[5]      During this period, the Honorable Magistrate Judge Edward S. Kiel stayed the parties' depositions pending resolution of the instant Motion.  (D.E. No. 65).

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The burden is on the moving party to show that the plaintiff has not stated a facially plausible claim.  *See Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016).

In evaluating the plaintiff's claims, the Court considers the allegations in the Complaint, as well as the documents attached to and specifically relied upon or incorporated therein.  *See Sentinel Trust Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." (internal quotation marks omitted)).  The Court may also consider and take judicial notice of matters of public record, including prior judicial proceedings and filings with the SEC.  *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-6509, 2018 WL 3772675, at *13 (D.N.J. Aug. 8, 2018) (collecting cases).

### B.  Rule 9(b) Heightened Pleading

The Court further observes that, independent of the standard on a Rule 12(b)(6) motion to dismiss, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard on securities fraud actions like the present one.  Under Rule 9(b), a party "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  This particularity requirement is "rigorously applied in securities fraud cases," *Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004), and to satisfy it, "a complaint must provide all of the essential factual background that would accompany the first paragraph of

any newspaper story—that is, the who, what, when, where and how of the events at issue." *United States v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (internal quotation marks omitted)).   In other words, a complaint "must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223–24 (3d Cir. 2004)).   "[B]oilerplate and conclusory allegations will not suffice." *In re Burlington*, 114 F.3d at 1418.   Rather, "[p]laintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible."[6] *Id.*

## III.   DISCUSSION

Hug advances four overarching arguments as to why the SEC's Complaint must be dismissed in its entirety.   First, Hug argues that the SEC has failed to plead fraud with the requisite particularity under Rule 9(b).   (Def. Mov. Br. at 14–24.)   Second, Hug argues that the SEC has failed to allege any material misstatements or omissions.   (*Id.* at 24–31).   Third, Hug argues that federal securities laws do not require improper expense reimbursements obtained by a company's executive officer to be disclosed as executive "compensation" within the meaning

---

[6]       In conjunction with Rule 9(b)'s heightened pleading requirement, Hug would also have this Court apply the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). (Def. Mov. Br. at 12 & 19).   The PSLRA requires a plaintiff bringing a securities fraud action based on "an untrue statement of a material fact" or an omission of "a material fact" to "specify [in the complaint] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1); *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).   This requirement is largely comparable to Rule 9(b)'s particularity requirement. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).   However, the PSLRA's requirement for pleading scienter (discussed *infra* Section IV.A.3.) "marks a sharp break with Rule 9(b)" and is more exacting. *Id.*   Under the PSLRA, a plaintiff must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *In re Aetna*, 617 F.3d at 277–78.   Regardless, the Court finds that this SEC enforcement action, while still subject to the well-established principles of Rule 9(b), is not subject to the PSLRA's pleading requirements, as the plain language of the statute expressly provides that they apply in "any *private action*" for securities fraud. 15 U.S.C. § 78u-4(b)(1) & (b)(2)(A) (emphasis added); *see, e.g.*, *SEC v. Kearns*, 691 F. Supp. 2d 601, 609 n.5 (D.N.J. 2010) ("While the [PSLRA] requires private plaintiffs in securities fraud actions to plead scienter with particularity, the SEC is not subject to the PSLRA and need not plead scienter with particularity.").

of Item 402.  (*Id.* at 32–35).  Lastly, Hug argues that the SEC cannot employ "group pleading" to hold him liable for Streams' alleged wrongdoing.  (*Id.* at 35–37).  For purposes of clarity, the Court will address Hug's first three arguments within the context of the nine claims against him. The Court will then address Hug's remaining argument on group pleading.

### A.      Counts I, II & III

In Count I, the SEC asserts that Hug violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  (Compl. ¶¶ 42–45).  Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5, in turn, makes it unlawful "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(a)–(c).  Traditionally, under subsection (b), an individual must "make" the allegedly misleading statements or omissions of material fact, while subsections (a) and (c) cover what is referred to as "scheme liability" for allegedly deceptive conduct, as opposed to allegedly deceptive statements.  *De Vito v. Liquid Holdings Grp., Inc.*, No. 15-6969, 2018 WL 6891832, at *41 (D.N.J. Dec. 31, 2018) (citing *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 n.29 (3d Cir. 2011)).  The SEC invokes all three subsections against Hug in Count I. (Compl. ¶¶ 42–45).

In Counts II and III, the SEC asserts that Hug violated Sections 17(a)(1) and 17(a)(3) of

the Securities Act, 15 U.S.C. § 77q(a).  (Compl. ¶¶ 46–53).  Section 17(a)(1) makes it unlawful for any person in the offer or sale of any security to "employ any device, scheme, or artifice to defraud," whereas Section 17(a)(3) make its unlawful to "engage in any transaction, practice, or course of business which operates . . . as a fraud or deceit upon the purchaser [of securities]."  15 U.S.C. § 77q(a)(1) & (3).  With language nearly identical to that of Rule 10b-5(a) and (c), Section 17(a)(1) and (3) claims are also "scheme claims."

Section 10(b), Rule 10b-5, and Section 17(a), generally known as the antifraud provisions, "all proscribe fraudulent conduct in connection with the purchase and/or sale of securities, and the elements required to prove violations are essentially the same."  *SEC v. Dubovoy*, No. 15-6076, 2016 WL 5745099, at *3 (D.N.J. Sept. 29, 2016) (quoting *SEC v. Desai*, 145 F. Supp. 3d 329, 335 (D.N.J. 2015)).  The SEC must allege, with some variation, that the defendant: (1) made material misrepresentations or omissions, or employed a fraudulent device or scheme, (2) with scienter, (3) in connection with the purchase or sale of a security.  *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 349 (D.N.J. 2009); *Dubovoy*, 2016 WL 5745099, at *3.  "Unlike a private litigant, the SEC need not prove either reliance or damages."  *Lucent Techs.*, 610 F. Supp. 2d at 349 (citing *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 206 n.6 (3d Cir. 2001)).

Here, Counts I, II, and III are based on the SEC's allegations that Hug committed fraud by charging personal expenses to SITO's company credit card, improperly coding them as business expenses to make them appear legitimate.  (Compl. ¶¶ 21–22, 27 & 42–53).  Consequently, SITO allegedly underreported Hug's executive compensation in its proxy statements and annual reports filed with the SEC.  (*Id.* ¶¶ 31–37).  Hug challenges these allegations on several grounds.

### 1.   Item 402 and the Duty to Disclose Executive Compensation

Hug argues that the SEC's legal theory underlying the Complaint—that SITO was required to disclose Hug's improperly coded expenses as personal benefits or perquisites in its 2014 and 2015 proxy statements—is not actionable because he was under no duty to disclose these expenses.  (Def. Mov. Br. at 32–35).

The  "non-disclosure of material information will  not  give  rise  to  liability  under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information.  'Silence, absent a duty to disclose, is not misleading under Rule 10b-5.'"  *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).  The Third Circuit has identified three instances when such a duty to disclose may arise: (i) when there is insider trading, (ii) when a statute requires disclosure, or (iii) when a prior disclosure is inaccurate, incomplete, or misleading.  *Id.* at 285–86.  Alleging that Item 402 of Regulation S-K, 17 C.F.R. § 229.402, required SITO to disclose Hug's misappropriated funds as executive compensation, the SEC's Complaint falls under the second prong.  Indeed, Item 402 requires public companies to disclose in their Forms 10-K "[a]ll other compensation for the covered fiscal year" that is "awarded to, earned by, or paid to" their executive officers, including "[p]erquisites and other personal benefits, or property, unless the aggregate amount of such compensation is less than $10,000."  17 C.F.R. § 229.402(a)(2) & (c)(2)(ix)(A).

Here, the parties dispute whether Hug's allegedly improper expense reimbursements are "compensation" required to be disclosed under Item 402.  The answer turns on whether Hug was merely "looting" (taking property without authorization) or whether payments to him were authorized by SITO.

Relying on the non-binding decision in *Andropolis v. Red Robin Gourmet Burgers, Inc.*,

Hug argues that Item 402 "does not contemplate the disclosure of 'compensation' *taken* from a company, but is limited to compensation 'awarded to, earned by, or paid to'" an executive officer.  505 F. Supp. 2d 662, 685 (D. Colo. 2007) (emphasis added); (Def. Mov. Br. at 34).  In *Andropolis*, plaintiffs filed a class action suit against various defendants, including Red Robin Gourmet Burgers, Inc. ("RR"), for, among other things, using corporate funds to pay personal expenses of a senior executive for his use of a chartered jet.  505 F. Supp. 2d at 682.  The court found that the executive's improper usage of a chartered aircraft was not compensation "awarded to, earned by, or paid to" him by the company, but rather constituted an instance of "a senior executive taking advantage of weak internal controls for his own personal gain." *Id.* at 684–85. Once the executive's usage was discovered, he was required to reimburse RR for his expenses. *Id.* at 685.

By contrast, the SEC argues that the instant case is more like *SEC v. Das*, No. 10-0102, 2010 WL 4615336 (D. Neb. Nov. 4, 2010), another non-binding decision.  (Pl. Opp. Br. at 18). There, the SEC alleged, among other things, that a company's CFO caused the CEO to receive approximately $9.5 million in company funds to pay for personal expenses, including the use of corporate jets, yachts, cars, credit cards, life insurance policies, homes, and country club memberships. *Das*, 2010 WL 4615336, at *2.  In *Das*, the SEC further alleged facts that the company's CFO approved these expenses and did not disclose them as executive perquisites despite knowing their personal nature and receiving notice of concerns about the payments from the company's internal auditors. *Id.*  Acknowledging that Item 402 cases involve a fact-specific inquiry as to "*what* must be disclosed," the *Das* court distinguished the case before it from *Andropolis*, stating:

> The court in *Andropolis* recognized that almost all cases interpreting Item 402 involve money or benefits knowingly given

> to executives by the company. While the money in *Andropolis* clearly had been wrongfully taken, in this case, the SEC has stated a claim that [d]efendants knowingly caused [the company] to pay for [the CEO's] private expenses. In other words, the [c]omplaint sufficiently alleges that through the [d]efendants' actions, [the company] awarded the funds to [the CEO]. Accordingly, the Court will not dismiss the SEC's claim on the basis that the perquisites cannot be considered compensation.

*Id.* at *7 (internal citation omitted); *see also SEC v. Kovzan*, 807 F. Supp. 2d 1024, 1038 (D. Kan. 2011) (denying CFO's motion to dismiss on this same basis where the SEC alleged facts suggesting that he had notice of CEO's expense problems, that the CEO received reimbursements for personal expenses nonetheless, and that the CEO was not required to repay all such reimbursements).

Having considered this caselaw, the Court finds that the SEC's allegations against Hug, though meager and, as explained below, inadequately pleaded, sound closer to the company-authorized payments under *Das* and *Kovzan* than to the "looting" in *Andropolis*. It is not lost on the Court that there are no specific allegations, as there are in *Das* and *Kovzan*, detailing whether Hug submitted supporting documentation for his expenses and to whom, whether anyone at SITO raised concerns about the expenses, or whether SITO required Hug to reimburse the company for his alleged improper taking of company funds. *See Das*, 2010 WL 4615336, at *2; *Kovzan*, 807 F. Supp. 2d at 1038. The SEC's allegations do suggest, however, that Hug did not merely take company funds, but either authorized them or caused them to be authorized to pay his personal expenses. For instance, after allegedly charging $11,000 to SITO's charge card for his fiftieth birthday party and his daughter's sixteenth birthday party, he "subsequently *directed* SITO's accounting department to record all related costs as business expenses." (Compl. ¶ 22) (emphasis added). Streams, as SITO's CFO, was then ultimately responsible for reviewing and approving Hug's expenses and general ledger coding. (*Id.* ¶ 28). Based on these allegations, the

13

Court will not dismiss the SEC's Complaint against Hug on the basis that the personal benefits and perquisites he allegedly obtained cannot be considered compensation within the meaning of Item 402.

### 2.    The Alleged Expense Fraud

Next, Hug argues that the SEC's Complaint lacks particularized allegations required to plead fraud under Rule 9(b).  (Def. Mov. Br. at 14–16).  In response, the SEC argues that its allegations "expressly place[] Hug on notice as to the who, what, when, where, and how of his security fraud."  (Pl. Opp. Br. at 5–6) (internal quotation marks omitted).

As noted above, the conduct at issue in this case is Defendants' alleged expense fraud; however, the only facts alleged as to Hug are that from August of 2014 until his resignation in February of 2017, he charged more than $100,000 in personal expenses to SITO's credit card, such as airfare for family trips, sporting tickets, designer clothes, and resort stays.  (Compl. ¶ 2).[7] While Streams is charged with engaging in the same conduct, the SEC has not alleged that Defendants knew of one another's conduct or were colluding or conspiring together.  (*See generally id.*; Def. Mov. Br. at 35).

Moreover, while the SEC alleges that Hug misappropriated $100,000, the Complaint identifies only two categories of transactions: the birthday party expenses for Hug and his child, with charges totaling $11,000.  (Compl. ¶ 22).  As Hug aptly argues, the SEC has merely concluded that a subset of expenses over the course of more than two years was improper without providing any breakdown or further details of those expenses (or at least a sample thereof)—*i.e.*, the months or years the charges were made, where they were made and for what

---

[7]    Indeed, the timing of Hug's alleged conduct is contradicted in the two allegations that speak to his actions. (*Compare* Compl. ¶ 2 (alleging that Hug improperly used SITO's charge card to make non-business purchases over $100,000 from "August 2014 until his resignation in February 2017"), *with id.* ¶ 22 (alleging that Hug's non-business purchases exceeding $100,000 occurred "[i]n calendar years 2014 through 2016")).

14

purpose, who they were paid to and in what amounts, or how they were coded on expense spreadsheets for accounting.  (Def. Mov. Br. at 14–16).  To be clear, "[r]ule 9(b) does not require plaintiffs to plead 'every material detail of the fraud,'" but it does require that "they use 'alternative means of injecting precision and some measure of substantiation into their allegations[.]'"  *Dubovoy*, 2016 WL 5745099, at *4 (quoting *In re Rockefeller*, 311 F.3d at 216). The SEC plainly has not done so here in its allegations against Hug.  Accordingly, the Court agrees with Hug, and finds that while the SEC's allegations are not entirely implausible, they are not sufficiently particular to place Hug on notice of the *precise* misconduct with which he is charged pursuant to Rule 9(b).  *See Frederico*, 507 F.3d at 200–01.

### 3.    Scienter

Hug also argues that the SEC has failed to sufficiently allege facts supporting the element of scienter.  (Def. Mov. Br. at 20–21).  Securities fraud claims generally require a plaintiff to plead and prove scienter—that is, a mental state "embracing an intent to deceive, manipulate, or defraud, either knowingly or recklessly."[8]  *See SEC v. RRBB Asset Mgmt., LLC*, No. 20-12523, 2021 WL 3047081, at *2 (D.N.J. July 20, 2021) (citing cases).  While Rule 9(b) requires that states of mind need only be alleged generally, as opposed to with particularity, "plaintiffs must still allege facts that show . . . their basis for inferring that the defendants acted with 'scienter.' Otherwise, . . . suits based on no more than plaintiffs' detection of a few negligently made errors in company documents or statements . . . could survive the pleading threshold."  *In re Burlington*, 114 F.3d at 1418; *see also Dubovoy*, 2016 WL 5745099, at *5 (noting that scienter "'may be alleged generally,' provided that the SEC's factual allegations support a plausible

---

[8]    While "the language of [Section] 17(a) requires scienter under [Section] 17(a)(1)," it does not require scienter "under [Section] 17(a)(2) or [Section] 17(a)(3)."  *Aaron v. S.E.C.*, 446 U.S. 680, 697 (1980).  The subsection addressing scienter therefore does not apply to Count III for alleged violations of Section 17(a)(3) of the Securities Act.

inference of scienter").  Accordingly, the SEC may establish scienter either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Burlington*, 114 F.3d at 1418, 1422.

Here, the Complaint includes conclusory statements that Hug knew, or was reckless in not knowing, that he was misappropriating corporate funds and causing SITO's SEC filings to reflect false and misleading information regarding his executive compensation.  (*See generally* Compl.).  Otherwise, it is wholly devoid of factual allegations identifying circumstances that show Hug had both motive and opportunity to engage in such conduct, or that show he acted with conscious misbehavior or recklessness.  *See In re Burlington*, 114 F.3d at 1418, 1422. Thus, the Court finds that the SEC has failed to sufficiently plead the element of scienter with particularity.

### 4.      Scheme Liability

Hug argues that the SEC has similarly failed to sufficiently allege facts of a "deceptive act" to support its scheme liability claims under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3).  (Def. Mov. Br. at 23–24).

Scheme liability depends upon whether, in connection with the purchase, offer, or sale of securities, defendants "committed a deceptive or manipulative act."  *Takata v. Riot Blockchain, Inc.*, No. 18-2293, 2020 WL 2079375, at *14 (D.N.J. Apr. 30, 2020).  To sufficiently plead such claims under Rule 9(b)'s heightened pleading requirements, Plaintiff must set forth "what manipulative [or deceptive] acts were performed, which defendants performed them, when the manipulative [or deceptive] acts were performed and what effect the scheme had on the securities at issue."  *Id.* (quoting *In re Royal Dutch/Shell Transport Sec. Litig.*, No. 04-0374,

2006 WL 2355402, at *7 (D.N.J. Aug. 14, 2006)).  For the same reasons the Court could not find that the SEC pleaded the underlying expense fraud with particularity—based on the minimal and generalized facts as to Hug—the Court cannot find that the SEC has sufficiently pleaded particularized facts demonstrating that Hug acted in furtherance of a scheme to defraud.[9]

### 5.    Materiality

Hug argues that the SEC has failed to tie the alleged expense fraud to any *material* misstatement or omission, a necessary element to plead its fraud claims.  (Def. Mov. Br. at 24). Hug points to two metrics in support of his argument: (i) that $100,000 is an "infinitesimal fraction" of SITO's operating expenses and Hug's disclosed compensation during the period at issue, and (ii) that SITO's stock price was not negatively impacted, but actually increased, immediately following the disclosure of the alleged misappropriation.  (*Id.* at 24–29).

In response, the SEC argues, at length, that determining materiality by looking to the market's reaction—by employing the efficient market hypothesis—is inapplicable and irrelevant to an enforcement proceeding like this one.  (Pl. Opp. at 10–13).  Instead, the SEC urges the Court to look beyond the numbers and consider qualitative factors, like whether "there was a substantial likelihood that a reasonable SITO shareholder would have considered Hug's fraudulent and unauthorized use of SITO funds to be important information when deciding whether to vote for [him] as a member of SITO's board of directors."  (*Id.* at 8).

Materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).  Materiality is satisfied when "there is 'a substantial likelihood that the disclosure of the

---

[9]       The Court observes that the SEC's misstatement claim under Rule 10b-5(b) and its scheme liability claims under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3) appear to be based on identical misconduct: Hug's alleged misappropriation of funds causing SITO to underreport his compensation.  (Compl. ¶¶ 42–53; Def. Mov. Br. at 24). The SEC does not appear to dispute or otherwise address Hug's scheme liability argument in its opposition brief. (*See generally* Pl. Opp.).

omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc.*, 485 U.S. at 231–32). "[T]he materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005). This standard of measurement is known as the *Oran-Burlington* standard, ratified by the Third Circuit in light of its commitment to the efficient market hypothesis ("EMH"), or the idea that "information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices." *Id.* at 269 n.5 (quoting *In re Burlington*, 114 F.3d at 1425) (internal quotation marks omitted).

Because materiality is often highly fact-specific, courts have noted that it is typically an issue reserved for the factfinder. *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) ("[T]he emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings."). "Only if the alleged misrepresentations or omissions are so *obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *In re Adams Golf*, 381 F.3d at 275 (internal quotation marks omitted).

At the outset, the Court notes that the Complaint is devoid of factual allegations concerning the financial impact of the alleged misstatements or omissions, such as (i) whether they resulted in a material inaccuracy in SITO's overall financial performance or a restatement of its financial reports, (ii) whether the undisclosed compensation was material in relation to Hug's disclosed compensation or SITO's overall operating expenses, (iii) whether SITO's stock price

dropped immediately following disclosure of the pertinent information, or (iv) whether the market was efficient.  (*See* Def. Mov. Br. at 28).

Without any supporting factual allegations, the Court is left looking at the numbers alone. Indeed, the $100,000[10] that Hug allegedly caused to be misreported appears to be a small percentage of SITO's overall financial metrics for the period at issue.  (*Id.* at 27).  For instance, $100,000 constitutes roughly 3.08% of Hug's total disclosed compensation of $3,249,216 for years 2014 through 2016, and roughly 0.156% of SITO's total operating expenses of $63,913,289[11] for years 2014 through 2016.  (*See* Def. Ex. B at F-4; Def. Ex. C at 19; Def. Ex. D at F-6; Def. Ex. F at F-5; Def. Ex. J at F-4; D.E. No. 11-13, SITO's 2017 Definitive Proxy Statement ("Def. Ex. L") at 25).

The SEC does not dispute Hug's points on the quantitative materiality of the misstatements, but it urges the Court to look beyond the numbers to qualitative materiality—*i.e.*, whether "there was a substantial likelihood that a reasonable SITO shareholder would have considered Hug's fraudulent and unauthorized use of SITO funds to be important information when deciding whether to vote for Hug as a member of SITO's board of directors."  (Pl. Opp. Br. at 8).  Interestingly, however, the SEC does not plead factual allegations that support reaching these inferences.

Furthermore, the SEC strongly contests the applicability and relevancy of EMH to this enforcement action.  Relying on the Third Circuit's decision in *In re Constar International Inc.*

---

[10]    The Court will use $100,000 as the minimum amount that Hug allegedly caused to be misreported. Although the Complaint claims that Hug improperly charged over $100,000 using SITO's charge card (*see* Compl. ¶¶ 2 & 22), the barebones pleading provides no basis to determine the total charges in excess of $100,000.  (*See generally id.*).

[11]    As discussed in Section I.A, n.2, *supra*, there is a discrepancy between Hug's calculation of SITO's 2015 operating expenses and the Court's calculation of those operating expenses.  To arrive at SITO's total operating expenses for years 2014 through 2016, the Court used the amount of $19,422,023 for the year 2015.  Had the Court used Hug's amount of $25,779,639 for the year 2015, SITO's total operating expenses for years 2014 through 2016 total $70,270,905, of which $100,000 represents 0.142%.  (*See* Def. Mov. Br. at 27).

*Securities Litigation*, 585 F.3d 774, 780 (3d Cir. 2009), the SEC contends that EMH is inapplicable where reliance and loss causation are not elements a party must prove to succeed on its claims.   (Pl. Opp. Br. at 10–13).   But *In re Constar* does not stand for such a sweeping assertion.   In that case, a class of investors sought relief against Constar under Section 11 of the Securities Act, 15 U.S.C. § 77k.   *In re Constar*, 585 F.3d at 778.   Constar and the other defendants claimed that the district court had improperly certified a class because, unless plaintiffs proved market efficiency, materiality was necessarily an investor-by-investor issue that defeated Rule 23's predominance requirement.   *Id.* at 780.   The Third Circuit rejected this argument.   Confirming that "[EMH] can be useful in assessing the materiality of misrepresentations in securities actions, including § 11 claims and claims made under § 10(b) of the Exchange Act," the Court concluded that materiality "is an objective standard" for which "an *individualized* inquiry is not required" "where reliance and loss causation are not part of the equation."   *Id.* at 784, 786 (noting that had *In re Constar* involved "a § 10(b) claim, or another claim requiring reliance and proof of loss causation, the efficiency issue might be instructive, if not dispositive") (emphasis added).   The Court is therefore unpersuaded by the SEC's current arguments that *In re Constar* completely precludes the application of EMH or the *Oran-Burlington* standard to this case.

To that end, Hug identifies two dates—March 16, 2017, and April 17, 2017—when SITO made disclosures about Hug's alleged misconduct, along with stock prices relevant to those time periods.[12]   On March 16, 2017, SITO filed a Form-8K disclosing that Streams had resigned as

---

[12]   Hug also identifies a disclosure date of March 28, 2017, the date of SITO's fourth quarter earnings call, but does not elaborate on what disclosures pertinent to him were made.   (*See* D.E. No. 20-3, Disclosures and SITO Stock Price Movement ("Def. Ex. N") at n.6; D.E. No. 20-5, SITO's Mar. 28, 2017 Earnings Call Transcript ("Def. Ex. P")).

CFO,[13] that an Interim CFO had been appointed to replace him and that:

> [f]ollowing the resignation of former CEO Gerard Hug, the Audit Committee of the Board of Directors engaged an independent law firm and an accounting consulting firm to conduct an inquiry into the use of the company's charge and debit cards, as well as certain cash withdrawals. The ongoing inquiry identified the misappropriation of company funds by each of Streams and Hug. The company is implementing changes and enhancements to its controls and procedures with respect to these matters. The findings from this review relate to expense items that have been recognized in the company's financial statements.

(D.E. No. 11-8, SITO's 2017 Form 8-K ("Def. Ex. G") at 6 (ECF pagination)).  On March 15, 2017, the trading day prior to the day of disclosure, SITO's stock closed at $2.17.[14]  (D.E. No. 20-4, SITO's March 2017 Stock Prices ("Def. Ex. O") at 2 (ECF pagination)).  On March 16, 2017, the day of the disclosure, SITO's stock remained essentially unchanged, closing at $2.18. (*Id.*).  On March 17, 2017, the day immediately following the disclosure, SITO's stock price rose, closing at $2.42.  (*Id.*).  And over the next three trading days on March 20, 21, and 22, 2017, SITO's stock closed at $2.24, $2.30, and $2.23, respectively, all higher than on the day of the disclosure.  (*Id.*).

Approximately one month later, on April 17, 2017, SITO disclosed in its 2016 Form 10-K the extent of the alleged misappropriation, reiterating the above information in greater detail:

> On February 17, 2017, Jerry Hug resigned as [CEO] and director of the Company.  Also, on March 10, 2017, Kurt Streams resigned as [CFO] of the Company.  Following the resignation of Mr. Hug, our Audit Committee engaged an independent law firm and an accounting consulting firm to conduct an inquiry into the use of the Company's credit and debit cards, as well as certain cash withdrawals.  The ongoing inquiry identified the misappropriation of company funds by each of Messrs Streams and Hug.  The

---

[13]    SITO publicly disclosed that Hug resigned on February 17, 2017, but did not disclose the circumstances surrounding his resignation.  (*See* D.E. No. 20-2, SITO's Feb. 17, 2017 Form 8-K ("Def. Ex. M") at 2).

[14]    The Court may take judicial notice of quoted stock prices for publicly traded stocks.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

independent law firm and accounting consulting firm completed the inquiry and concluded that over two years, the former CEO/CFO had misappropriated approximately $330 thousand in aggregate including credit and debit cards, cash withdrawals, and extra payroll. This amount was identified to have been properly expensed in the appropriate periods. Management does not believe that this deficiency increased the likelihood of a material misstatement to more than remote since mitigating controls did exist and operated effectively during the fiscal year for proper identification and classification of the transactions.

(Def. Ex. J at 28).  On April 13, 2017, the trading day prior to the day of this disclosure, SITO's stock closed at $2.59.  (D.E. No. 20-7, SITO's April 2017 Stock Prices ("Def. Ex. R") at 2 (ECF pagination)).  On April 17, 2017, the day of the disclosure, SITO's stock closed at $2.55, a 1.5% drop from the previous day.  (*Id.*; Def. Ex. N).  On April 18, 2017, the day immediately after the disclosure, SITO's stock rose, closing at $2.60.  (Def. Ex. R).  And over the next three trading days on April 19, 20, and 21, 2017, SITO's stock closed at $2.58, $2.70, and $2.61, respectively, all higher than on the day of the disclosure.  (*Id.*).

Although SITO's stock price closed at 1.5% less on April 17, 2017—the day of the updated disclosure—the March 16, 2017 disclosure appears to not have had any appreciable negative impact on SITO's stock prices.  (*See* Def. Ex. N).  Without expert analysis into the market fluctuations on April 17, 2017, the Court cannot conclude whether the 1.5% drop was the result of some extraneous factor affecting the market or whether SITO's stock dropped due to its more detailed disclosure concerning the alleged misappropriation, such that investors found it to be material.  Nonetheless, while the Court will not dismiss the SEC's fraud claims at this juncture on the grounds of the stock-drop analysis above, it dismisses the claims for its failure to adequately plead materiality.  In other words, the Complaint does not contain allegations reflecting whether there was "a substantial likelihood that the disclosure of [Hug's improper expenses] would have been viewed by the reasonable investor as having significantly altered the

total mix of information made available." *Matrixx*, 563 U.S. at 38 (internal quotation marks omitted).

### B.     Count IV

In Count IV, the SEC asserts that Hug violated Rule 13a-14 under the Exchange Act, 17 C.F.R. § 240.13a-14.  (Compl. ¶¶ 54–56).  Rule 13a-14 requires executive and financial officers to certify the accuracy of the company's public reports under Section 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241(a).  In doing so, the signing officers certify that, to the best of their knowledge, "the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report[.]"  15 U.S.C. § 7241(a)(2)–(3).  The signing officers also certify that that they have disclosed to the company's auditors "any fraud, whether or not material, that involves management or other employees who have a significant role in the [company's] internal controls."  *Id.* § 7241(a)(5)(B).

Here, as explained above, the SEC has not sufficiently pleaded the underlying expense fraud that forms the basis of the alleged misstatements or omissions in SITO's 2014 and 2015 proxy statements at issue in Count IV.  Similarly, the SEC has not pleaded materiality with respect to the alleged misstatements or omissions in either of the proxy statements at issue. Accordingly, Count IV is dismissed.

### C.     Counts VI and VII

In Counts VI and VII, the SEC asserts that Hug violated certain provisions of Section

13(b) of the Exchange Act, which "requires issuers to keep accurate books and records and to maintain an adequate system of internal controls." *Lucent Techs.*, 610 F. Supp. 2d at 369. Count VI alleges that Hug made false or misleading statements to SITO's auditors and caused SITO's books and records to be falsified, in violation of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), and Rules 13b2-1 and 13b2-2 thereunder, 17 C.F.R. §§ 240.13b2-1 and 240.13b2-2.[15] Along the same lines, Count VII alleges that Hug "knowingly circumvented or knowingly failed to implement a system of internal accounting controls or . . . knowingly falsified or caused to be falsified books, records, or accounts," in violation of Section 13(b)(5) of the Exchange Act, 15 U.S.C § 78m(b)(5).[16]  (Compl. ¶ 66).

Both Counts suffer from the same fatal flaw as Counts I, II, and III in that, while they are plausible, they lack particularized factual allegations demonstrating that Hug engaged in fraudulent conduct causing SITO's books and records to be false, that SITO's internal controls were in any way inadequate, or that Hug knowingly circumvented SITO's accounting controls. Accordingly, Counts VI and VII are dismissed.

### D.    Counts VIII, IX, and X

In Counts VIII, IX, and X, the SEC asserts that Hug aided and abetted violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act, 15 U.S.C. §§ 78m(a)–(b)(2), 78n(a), and certain accompanying rules.  (Compl. ¶¶ 68–83).  "Section 13(a) of the

---

[15]    Section 13(b)(2)(A) provides that every issuer of securities shall "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A).  To that end, Rule 13b2-1 makes it unlawful to "directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A)." 17 C.F.R. § 240.13b2-1.  Rule 13b2-2 makes it unlawful for a director or officer to "[m]ake or cause to be made a materially false or misleading statement to an accountant" or to "[o]mit to state, or cause another person to omit to state, any material fact necessary in order to make statements made . . . not misleading, to an accountant in connection with" "[a]ny audit, review or examination of [the issuer's] financial statements" or "[t]he preparation or filing of any document or report" with the SEC.  17 C.F.R. § 240.13b2-2(a)(1)–(2).

[16]    Section 13(b)(5) provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in [Section 13(b)(2)]." 15 U.S.C. § 78m(b)(5).

Exchange Act and the SEC rules thereunder require issuers of securities to file factually accurate periodic reports with the SEC and to disclose such additional information as may be necessary to make the required statements not misleading." *Lucent Techs.*, 610 F. Supp. 2d at 368–69 (citing 15 U.S.C. § 78m(a)).  As previously mentioned, "Section 13(b) requires issuers to keep accurate books and records and to maintain an adequate system of internal controls." *Id.* at 369.  And lastly, Section 14(a) "makes it unlawful to solicit a proxy 'in contravention of such rules and regulations as the [SEC] may prescribe as necessary and appropriate in the public interest or for the protection of investors.'" *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007) (quoting 15 U.S.C. § 78n(a)).

To sustain a claim of aiding and abetting these violations, a plaintiff must establish "(1) the existence of a primary violation of the Exchange Act; (2) that the aider-abettor had knowledge of the primary violation; and (3) that the aider-abettor 'knowingly and substantially participated in the wrongdoing.'" *SEC v. Pasternak*, 561 F. Supp. 2d 459, 500 (D.N.J. 2008) (quoting *Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978)).  The SEC's barebones allegations against Hug do not adequately plead particularized facts of fraudulent conduct leading to SITO's false or misleading public SEC filings.  Without detailed allegations of such conduct to substantiate the existence of a primary violation of the Exchange Act, as well as a plausible inference of knowledge of misconduct, the SEC's aiding and abetting claims, cannot surpass the pleading stage.  Accordingly, Counts VIII, IX, and X are dismissed.

### E.      Improper Group Pleading

Hug's final argument is that the Complaint improperly relies on "group pleading" to conflate his and Streams' conduct and hold him liable for Streams' alleged wrongdoing.  (Def. Mov. Br. at 35–36).  The SEC may not have pleaded its allegations against Hug with the

25

requisite particularity, but for the allegations it does offer, there is a discernable distinction between the misconduct it attributes to Hug and the misconduct it attributes to Streams, as evidenced by the Court's recitation of the factual background.   Improper group pleading is therefore not one of the bases on which the Court will dismiss the Complaint.

## IV.    CONCLUSION

For the foregoing reasons, Hug's Motion is GRANTED.   Because the dismissal is based on the SEC's failure to adequately plead its claims against Hug, the dismissal is *without prejudice*.   To the extent Plaintiff can correct the deficiencies outlined above, it may file an amended complaint within thirty days.   An appropriate Order accompanies this Opinion.


Dated: March 22, 2022                              s/ *Esther Salas*_____

                                                                 **Esther Salas, U.S.D.J.**