**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                                        **Plaintiff,**<br><br>               **-against-**<br><br>**GERARD F. HUG, *et al*.,**<br><br>                                        **Defendants.** | **AMENDED COMPLAINT**<br>**AS TO GERARD F. HUG**<br><br>**Case No. 2:19-cv-16290-ES-JRA**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff United States Securities and Exchange Commission ("SEC") for its Amended

Complaint against Defendant Gerard "Jerry" F. Hug, alleges as follows:

## SUMMARY

1.      This amended complaint concerns improper personal expense abuses incurred by

Gerard F. Hug ("Hug"), the former Chief Executive Officer ("CEO") of SITO Mobile, Ltd.

("SITO").[1]

2.      From the time he became SITO's CEO in August 2014 until his resignation in

February 2017, Hug improperly charged SITO's corporate credit card with approximately

$77,000 in expenses that were personal in nature.  Hug also charged the corporate credit card

with more than $160,000 in expenses that had no apparent business purpose or for which he did

not provide sufficient verification or justification.  Hug regularly used SITO's corporate credit

card to pay for personal expenses such as airfare and resorts for family trips, sporting tickets,

---

[1]     On November 30, 2022, the Court entered a Final Judgment as to Defendant Kurt W.
Streams ("Streams"), SITO's former Chief Financial Officer [ECF No. 125].  This Amended
Complaint is filed against Mr. Hug only.

designer clothes, luxury items, donations to his son's private school, and college living expenses for his daughter.

3.      Hug's improper reporting of personal expenses as legitimate business expenses constituted false statements and omissions of fact that were material on both quantitative and qualitative bases.

4.      On a quantitative basis, the approximately $238,000 in personal and/or questionable expenses that Hug incurred from August 2014 to February 2017 represented approximately 27.25% of his total salary during this period, and 9.69% of his total compensation.

5.      In addition, as set forth herein, the market reacted unfavorably when the news that Hug's employment had been abruptly terminated was disclosed, after the market closed on February 17, 2017, dropping 10.5% between the closing of the market on February 17 and the opening on the next business day, which was February 21.  Analysts reacted unfavorably to the announcement that Hug had resigned unexpectedly and without explanation.

6.      On a qualitative basis, a reasonable investor would be deeply concerned that the public company in which it invested was run by a senior executive who misappropriated hundreds of thousands of dollars; used corporate accounts as a personal cash register; acted with dishonesty and lack of corporate integrity; and failed to institute and oversee a system of internal controls and compliance procedures designed to prevent and preclude such on-going corporate fraud.[2]

---

[2]      *SEC v. Das*, No. 8:10-cv-00102, 2010 WL 4615336, at *8 (D. Neb. Nov. 4. 2010) ("Investors may base their investment decisions, at least in part, on factors such as (1) reasonable and transparent executive compensation, (2) the company's history of independent arms-length transactions with third parties, made in the company's best interest, and (3) management ethics and accountability."); *SEC v. Pace*, 173 F.Supp.2d 30, 33 (D.D.C. 2001) ("Investors have a right to know—and would reasonably consider it important—when the head of a publicly-owned company is stealing any quantity of money from their company.").

7.     Hug abused his position as senior management at SITO by falsely coding personal expenses as business expenses during the company expense reporting process, and also by submitting false requests for reimbursement of purportedly business-related expenses that misstated the true character of their expenses.  Although SITO's policies and procedures required Hug to submit expense reports with accompanying receipts or justification, he often failed to do so, and as CEO of SITO, failed to require and direct SITO to enforce and comply with its policies and procedures with respect to such expenses.

8.     As a senior executive of SITO, Hug knew, was reckless in not knowing, or should have known, that such false reporting of his personal expenses would cause these expenses to be improperly entered into the company's general ledger as business expenses.

9.     Hug further knew, was reckless in not knowing, or should have known, that his false reporting of expenses in the general ledger would then be incorporated into SITO's financial statements and other books and records, and published to investors in SITO's proxy statements, annual statements, quarterly and annual filings, and other public filings and disclosures, as described herein.

10.    Hug, as SITO's CEO, was responsible for SITO's internal accounting controls, but failed to implement and exercise sufficient controls over corporate expense reimbursement and cash withdrawals.  He continually failed to direct SITO to enforce SITO's expense payment controls, which required employees (including themselves) to justify that their charges were for legitimate corporate purposes.

11.    Due to the misconduct of Hug, and the deficient internal controls of the company that he directed, controlled, and oversaw, the reimbursement of Hug for improper personal expenses, was not accurately recorded in SITO's books and records.

12.     As part of his improper course of conduct, Hug repeatedly engaged in improper acts and practices on behalf of the corporation that he was charged to lead, which included signing SITO's annual reports on Form 10-K for fiscal years 2014 and 2015, and also for the transitional period on Form 10-KT in 2015, and providing certifications contained in those reports, which were filed with the SEC.  Hug also signed management representation letters, provided to SITO's external auditors in connection with audits of the company's 2014 and 2015 financial statements, in which he falsely represented that he had no knowledge of management fraud.  In addition, SITO filed proxy statements in 2015 and 2016, containing certifications by Hug that did not disclose personal expenses as compensation, as required by law.

13.     Hug knew, was reckless in not knowing, or should have known that SITO's filings with the SEC contained materially false and misleading executive compensation disclosures and omitted, among other things, numerous personal expenses for which Hug was improperly reimbursed using SITO corporate funds.  Furthermore, Hug knew, was reckless in not knowing, or should have known that contrary to his certifications in annual reports and proxy statements, he was aware of management fraud.  Specifically, he knew, was reckless in not knowing, or should have known that he was personally misappropriating corporate funds.

14.     Because Hug and the CFO, Streams, failed to require and direct SITO to implement sufficient internal accounting controls, improper and unauthorized payments to them were not accurately recorded in the company's books and records.  As a result, SITO's annual reports and proxy statements materially understated the compensation paid to Hug and Streams in the form of personal benefits.  These annual reports and proxy statements were incorporated by reference in registration statements offering shares of SITO's common stock.  Hug's and

Streams' improper conduct resulted in SITO's materially misstated books and records, annual reports, and proxy statements.

## **VIOLATIONS**

15.     As a result of the foregoing, Defendant Hug violated Section 17(a)(3) of the Exchange Act [15 U.S.C. § 77q(a) (3)], Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)], Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14], Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1], and Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].   Unless Hug is permanently restrained and enjoined from violating these provisions, he will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## **JURISDICTION AND VENUE**

16.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a)].

17.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].   Certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws alleged in this Complaint occurred within the District of New Jersey.   For example, Hug worked in SITO's corporate offices in Jersey City, New Jersey, and there, on many occasions, improperly recorded payments for the benefit of, and sought reimbursements to, himself as business expenses, and not compensation.

18.     Hug, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the acts, practices, and courses of conduct alleged herein.

**DEFENDANT**

19.     **Gerard "Jerry" F. Hug** resides in New Jersey.  He served as CEO and director of SITO from November 2014 until his forced resignation on February 17, 2017.  Hug first joined the company—known then as Single Touch Systems, Inc. ("Single Touch")—in 2011 as Director of Corporate Development.  He was promoted to Executive Vice President in March 2013, and as interim CEO on August 27, 2014, serving in that position until November 10, 2014, when he became SITO's CEO.

**RELATED ENTITY**

20.     **SITO MOBILE, LTD.**, a Delaware corporation with its principal place of business in Jersey City, New Jersey, provides mobile data advertising platforms that enable its clients to push to consumers mobile advertisements, coupons and the like, based on location data derived from mobile devices.  SITO's common stock is registered with the SEC pursuant to Section 12(b) of the Exchange Act, and its securities are traded on the NASDAQ Capital Market. On August 5, 2019, SITO entered into settled administrative proceedings with the Commission related to the conduct alleged herein, in which the company consented to an Order providing that "SITO shall cease and desist from committing or causing any violations and any future violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act, and Rules 12b-20, 13a-1, 14a-3, and 14a9 thereunder."[3]

---

[3]     *See* Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order, No.

## FACTUAL ALLEGATIONS

### Hug's Expense Abuses

21.     Defendant Hug agreed in his employment contract, executed in 2011 that he was "entitled to reimbursement of documented reasonable business expenses incurred by [him] in the discharge of [his] duties hereunder, in accordance with the policies and procedures" of SITO.[4]

22.     From at least 2014 through 2017, SITO maintained an employee handbook, which outlined several policies, including procedures for reimbursement when employees incurred SITO-related business expenses.[5]  The employee handbook stated that SITO would "reimburse an employee for reasonable expenses incurred while traveling for business… and other expenses incurred in connection with the performance of [their] job."  To be eligible for reimbursement, employees were required to obtain supervisor approval, and submit a completed Travel and Expense Reimbursement Form with original receipts.[6]

---

3-19311, Exchange Act Release No. 86573 (August 5, 2019) (available at *https://www.sec.gov/litigation/admin/2019/34-86573.pdf).*

[4]     2011-06-27 Hug contract with Single Touch ("In the event of cessation of your employment, the Company shall pay you … (ii) any documented business expenses….").

[5]     Up until September 2014, a Single Touch employee handbook (revised January 2014) was used.  In 2015, a SITO employee handbook was issued.  The "Travel and Other Expense Reimbursements" sections of each handbook are identical.

[6]     2013 Employee Handbook for Single Touch Systems, Inc. and Single Touch Interactive, Inc. ("Expense forms must be completed by including the following information: Date and place expense was incurred, Amount of expense, Business purpose, Names and business relationship of all persons present.").

**Personal Expenses Improperly Charged By Hug**

23.     From at least August 2014 to February 2017, while CEO, Hug was provided with a SITO corporate American Express Card ("SITO AmEx Card") tied to SITO's corporate American Express account.  The card was for business expenses incurred in the performance of Hug's duties with SITO.  Hug did not receive a copy of a bill from American Express for this card.  The bill was sent directly to the company, and paid by SITO's accounting department — after Hug reviewed and coded charges on each statement.

24.     On a monthly basis, Hug's assistant provided Hug with a spreadsheet that detailed the expenses that he had charged to the SITO AmEx Card for the past month.  Per the company's policies and procedures, Hug was responsible for reviewing these expenses to determine if they were personal or business expenses.

25.     Hug would then have a monthly meeting with his assistant where they would go over the spreadsheet in detail.  Hug would instruct his assistant on how to apply specific codes for each expense, according to SITO's procedures for recording expenses on the company's general ledger.  The spreadsheet of expenses, as coded according to Hug's instructions, was then forwarded to SITO's accounting department, led by SITO's CFO, where it was reviewed and approved, and eventually incorporated into the company's general ledger as business expenses. From there, the general ledger was incorporated into SITO's financial statements, other books and records, and public filings and disclosures.

26.     Hug's assistant does not recall any instance in which Hug told her that a certain charge was personal, and should be coded as a personal and not a business expense, or that Hug needed to, or was going to, reimburse the company in part or whole for any expense.

- 8 -

27.     SITO's records also do not reflect any instance when Hug (i) instructed his assistant or the accounting department to change the general ledger coding on an expense from business to personal; or (ii) reimbursed the company for any personal expense.

28.     From August 2014 to February 2017, Hug charged, or directed his assistant to charge approximately $77,000 in personal expenses to the SITO corporate credit card as well as over $160,000 in other questionable expenses with no apparent business purpose and/or insufficient verification or justification.  Representative expenses improperly charged include: (1) family vacation trips to Aruba, Arizona, and California with Hug's wife and children; (2) business travel in which Hug's wife accompanied him; (3) gift cards, luxury items, clothing, electronic equipment, computer equipment, sporting events, and other items; (4) car repairs, optometrist expenses, and other personal services; and (5) birthday party celebrations for Hug's fiftieth birthday in a New Jersey restaurant, and for Hug's son's sixteenth birthday at a Manhattan hotel and restaurant.

## False and Misleading SEC Filings, Certifications, and Representations
### False Proxy Statements

29.     Certain regulations of the SEC require that an issuer disclose information about executive compensation.  In particular, Item 11 of Form 10-K requires that registrants furnish the information required by Item 402 of Regulation S-K [7 C.F.R. § 229.402].

30.     Item 402(a)(2), in turn, requires disclosure of "all plan and non-plan" compensation "awarded to, earned by, or paid to" named executive officers (including CEOs).

31.     Similarly, Item 8 of Schedule 14A requires that registrants set forth in a proxy statement the information required by Item 402 of Regulation S-K if action is to be taken with respect to, among other things, the election of directors.

32.     Item 402(c)(2)(ix)(A) requires disclosure of the total value of all "[p]erquisites and other personal benefits" provided to named executive officers who receive $10,000 or more in such perquisites or other benefits in a given year.  For smaller reporting companies, such as SITO, perquisites and other personal benefits shall be valued as the incremental cost to the company.  This disclosure is required to be made in the "All Other Compensation" column of a Summary Compensation Table.

33.     Hug's unauthorized and improper charges paid with SITO's corporate funds were not disclosed as personal benefits or perquisites in the Summary Compensation Tables in SITO's proxy statements filed for the fiscal years 2014 and 2015, as required.  In fact, SITO disclosed no perqs or personal benefits for any of its executives in their SEC filings.

34.     SITO used these inaccurate proxy statements to solicit annual shareholder votes to elect directors, including Hug.  The inaccurate proxy statements also solicited non-binding advisory votes from shareholders on executive compensation, including Hug's 2015 and 2016 compensation.

**False Annual Reports**

35.     SITO's annual reports incorporated the above proxy statements by reference with respect to executive compensation required to be reported in the annual reports.  Consequently, SITO's annual reports for fiscal years 2014 and 2015 also materially understated Hug's compensation.

36.     Hug signed SITO's annual reports on Form 10-K for fiscal years 2014 and 2015, and also for the transitional period on Form 10-KT in 2015 when the company changed to a calendar year-end from a fiscal year ended September 30.

**False Certifications**

37.     SITO's 2014 and 2015 annual reports included certifications required by the

Sarbanes-Oxley Act ("SOX"), pursuant to Rule 13a-14(a) of the Exchange Act [17 C.F.R. §

240.13a–14(a)], which were signed individually by Hug.  The certifications falsely and

unreasonably declared that based on his knowledge the reports did not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statement made,

in light of the circumstances under which such statements were made, not misleading.

38.     Hug falsely and unreasonably certified that he had disclosed any fraud by

management to the company's audit committee and the company's auditor, whether or not

material.

39.     Hug also signed management representation letters that were provided to SITO's

auditors with respect to audits of SITO's 2014 and 2015 financials, in which he falsely and

unreasonably declared that he had no knowledge of management fraud.

**Hug's Refusal to Testify**

40.     In testimony during the SEC staff's investigation, Hug asserted his privilege

against self-incrimination under the Fifth Amendment to the U.S. Constitution as to every

substantive question the SEC staff asked him about his tenure at SITO.

**Hug's Falsely Reported Personal Charges Were
Misstatements and Omissions of Material Fact**

41.     The amount of unreported compensation that Hug received by way of his false

and improper charging of personal expenses to SITO represent material misstatements and

omissions of fact that a reasonable investor would find important when making investment

decisions, on both a quantitative and qualitative basis.  These facts would have been viewed by

the reasonable investor as having significantly altered the total mix of information made available in the marketplace.

## Quantitative Analysis of Hug's Expenses

42.     Records produced by SITO and third parties indicate that from 2014 through 2017, Hug charged approximately $77,000 in personal expense**s** to SITO's corporate credit card and over $150,000 in other questionable expenses with no apparent business purpose and/or insufficient justification or verification.

43.     These personal and questionable expenses represented approximately 27.25% of Hug's total salary during this period, and 9.69% of his total compensation, a statistically significant and meaningful percentage, including personal and questionable expenses that represented approximately 39% of Hug's salary and over 16% of his total compensation in 2015, approximately 31% of his salary and over 6% of his total compensation in 2016, and approximately 55% of his salary and total compensation for the months he was employed by SITO in 2017.

44.     The market reacted swiftly and clearly when it learned that Hug had abruptly resigned from the company without explanation—an indicator that his resignation was potentially due to misconduct, wrongdoing, or some other malfeasance on Hug's part.

45.     SITO announced Hug's resignation on Friday, February 17, 2017, at 5:30 p.m., after the close of trading.  SITO's shares closed at $2.29 on February 17, 2017, and opened on the following Tuesday, February 21, 2017, after the President's Day weekend, at $2.04, a 10.5% drop, which was accompanied by a spike in volume trading.  This decline from close to open was one of the largest close-to-open drops during the years that SITO was listed on the NASDAQ.

46.     In response to the news of Hug's resignation, and the fact that no explanation had been provided for the resignation, which was unexpected, analysts lowered their price expectations for SITO and indicated that the drop in SITO's stock price was due to the news of Hug's resignation.  For example, on February 21, 2017, Cowen Inc.—a financial services company that provides market research—issued this statement: "This morning before market, SITO announced the resignation of Jerry Hug as CEO and named Board member Rory O'Connell as interim CEO. Shares traded down ~8% in mid-day trading."

47.     SITO disclosed the specific reasons for Hug's and Streams' resignation the following month, in a March 16, 2017, press release announcing that it was opening an internal investigation relating to Hug's and Streams' improper personal expenses.  By that point, however, the market had already absorbed the fact that SITO's CEO and CFO had abruptly resigned without explanation, and that negative news, indicative of misfeasance and lack of corporate integrity, had been absorbed into SITO's stock price.

## Qualitative Materiality

48.     CEO and senior executive perquisite use is important and material to investors.[7]

49.     On a qualitative basis, the misconduct of Hug a set forth herein reflects corporate dishonesty and lack of integrity, self-dealing, and misappropriations by senior management; the concealment of illegal conduct and transactions; and the company's inadequate compliance procedures and ineffective internal controls.  All of these factors are considered primary indicators of qualitative materiality.[8]

---

[7]     *See, e.g.*, Yermack, David, "Flights of fancy: Corporate jets, CEO perquisites, and inferior shareholder returns," *Journal of Financial Economics* 80 (2006) 211–242.

[8]     *See* Securities and Exchange Commission, Staff Accounting Bulletin, Release No. 99, 1999 WL 1123073 (Aug. 12, 1999).

50.     In addition, irregularities that affect the reliability of an entity's record keeping are generally considered qualitatively material, especially if they result from actions of management.[9]

51.     In particular, a reasonable investor would want to know, and would be deeply concerned to learn, that the CEO of SITO, as alleged herein, engaged in a four-year spending spree, using corporate funds and a corporate credit card as his own personal slush funds.  In particular, a reasonable investor would be deeply concerned to learn that throughout this period, a senior executive of SITO, charged with fiduciary obligation to his shareholders, acted with such disregard of common sense, professional ethics, fiscal restraint, and corporate policies and procedures that he was charged to oversee.

52.     A reasonable investor would also want to know, and would be deeply concerned, that Hug acted with dishonesty, and the lack of integrity and responsibility expected and required of corporate senior management; that he misappropriated hundreds of thousands of dollars from his company in the process; and directed and allowed the company to look the other way as he did so.

53.     A reasonable investor would also want to know, and would be deeply concerned, that the CEO of SITO failed to establish, maintain, and enforce a system of corporate governance and internal controls that would effectively root out and stop such improper expenses from being charged, reported, and recorded as business expenses in the company's books and records and public filings.

---

[9]     *See id.*

**Hug Acted with Knowledge, Extreme Recklessness, and/or Negligence**

54.     SITO records, including but not limited to those described above, indicate that Hug was personally involved in, and aware of, all of the personal expenses that he improperly charged to SITO for himself, family members, and family members' friends.

55.     For every personal expense that Hug improperly charged and directed be recorded in SITO's books and records, he had at least *three* opportunities to make the right decision and to exercise the corporate integrity that their investors and the market expected and required of a CEO.  He failed at every opportunity.

56.     *First,* Hug was clearly aware of the personal nature of the expenses at the time that he charged them.  For the vast majority of these expenses, SITO records demonstrate that Hug was aware of the smallest details of the expenses, and was hands-on in dealings with hotels, airlines, travel agents, restaurants, retail shops, car dealerships, a sorority and other vendors.

57.     *Second,* every month, during the expense reporting process, Hug had a fresh opportunity to review and reconsider his personal expenses, now with the benefit of hindsight and reflection.

58.     Every month Hug sat down with his assistant and went over the expense spreadsheet prepared for that purpose, reflecting all of his personal expenses.

59.     Every month, Hug coded (or directed his assistant to code) all of his personal expenses as business expenses, knowing, or recklessly disregarding, that they would be improperly entered as business expenses in SITO's books and records.

60.     Hug's assistant does not recall one instance when he told her to mark a personal expense as personal, or told her that he would reimburse the company for a personal charge.

61.     SITO records do not reflect any instance in which Hug asked anyone for advice or permission or clarification regarding whether a certain expense should be booked to the company, or indeed, how much of a hybrid expense, such as a business trip in which family members tagged along, or extra days were added, should be apportioned to the company.

62.     *Third,* at quarter and fiscal year end, during the company's reporting process, Hug had a final opportunity to exercise the corporate integrity demanded of a CEO of a public company.  Quarter after quarter, year after year, he let these opportunities pass.  He had a duty to review the company's financial statements, representation letters to its auditors, and its proxy statements, Forms 10-Q, and Forms 10-K filed with the SEC.  SITO's records do not reflect one circumstance in which Hug ever paused the reporting process, asked for any advice regarding any of these charges, or directed anyone to back out or reclassify any of his personal expenses.

63.     Accordingly, not only as SITO's CEO, but as an individual who actually made these charges, Hug knew, was reckless in not knowing, or should have known, that his false reporting of expenses caused SITO to falsely report its business and operations expenses in its general ledger, financial statements, and public filings.

64.     In addition, Hug knew, was reckless in not knowing, or should have known as CEO of the company, that to the extent that he claims that any of the personal expenses described herein were somehow part of their compensation packages with SITO, or otherwise were sanctioned or approved by the company, that the company was required to report such payments as compensation and perquisites in the company's proxy statements and other public filings, as described herein.

**Tolling Agreements**

65.     Between November 2018 and March 2019, Hug executed two separate tolling agreements with the Commission.  Each tolling agreement specifies a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against [Defendant] authorized, instituted, or brought by … the Commission… arising out of the [Commission's investigation of Defendant's conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended…."  Each tolling agreement further provides that the Defendant "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defenses."  Collectively, these agreements tolled the running of any limitations period or any other time-related defenses available to Hug, thereby preserving the timeliness of the Commission's claims as to all the conduct alleged herein.

**Withholding of Compensation from Hug**

66.     In February 2017, at the time Hug resigned from SITO, the company retained approximately $109,000 in compensation purportedly due and owing to Hug, in the form of severance and bonus payments, as a result of improper expenses Hug charged to SITO as alleged herein.  In addition, the company did not permit Hug to execute a certain amount of shares of SITO stock options.

## FIRST CLAIM FOR RELIEF
### Fraud in Connection with the Offer or Sale of Securities
### Violations of Section 17(a)(3) of the Securities Act

67.     The SEC re-alleges and incorporates by reference paragraphs 1 through 66, above.

68.     Defendant Hug, by engaging in the conduct alleged above, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon purchasers or prospective purchasers of securities.

69.     While engaging in the conduct alleged above, Defendant acted unreasonably.

70.     By engaging in the conduct described above, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## SECOND CLAIM FOR RELIEF
### False Sarbanes-Oxley Certification
### Violations of Rule 13a-14

71.     The SEC re-alleges and incorporates by reference paragraphs 1 through 66, above.

72.     From December 2014 to June 2016, Defendant Hug signed certifications that were required to be made pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].  In each signed certification, Hug falsely and unreasonably certified that (i) based on his knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statement was made, not misleading; and (ii)

based upon his most recent evaluation of SITO's internal control over financial reporting, he had disclosed any fraud, whether or not material, involving management to the audit committee and the auditors.

73.    By engaging in the conduct described above, Defendant violated Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14] and unless restrained and enjoined will continue to do so.

### THIRD CLAIM FOR RELIEF
**Lying to Auditors and Falsification of Books and Records**
**Violations of Rules 13b2-2 and 13b2-1 of the Exchange Act**

74.    The SEC re-alleges and incorporates by reference paragraphs 1 through 66, above.

75.    Defendant Hug, by engaging in the conduct above, directly or indirectly: (i) made, or caused to be made, materially false or misleading statements; or (ii) omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, to an accountant in connection with an audit, review, or examination of financial statements or the preparation or filing of a document report required to be filed with the SEC, including SITO's annual reports on Forms 10-K filed for reporting years 2014 and 2015.

76.    By engaging in the conduct alleged above, Defendant, directly or indirectly, falsified or caused to be falsified books, records, or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

77.    By engaging in the conduct described above, Defendant violated Rules 13b2-2 and 13b2-1 of the Exchange Act [17 C.F.R. §§ 240.13b2-2 and 240.13b2-1] and unless restrained and enjoined will continue to do so.

## FOURTH CLAIM FOR RELIEF

### Circumventing and Failing to Implement a System of Accounting Controls
### Violations of Section 13(b)(5) of the Exchange Act

78.    The SEC re-alleges and incorporates by reference paragraphs 1 through 66,

above.

79.    By engaging in the conduct alleged above, Defendant Hug knowingly

circumvented or knowingly failed to implement a system of internal accounting controls or,

directly or indirectly, knowingly falsified or caused to be falsified books, records, or accounts

subject to Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

80.    By engaging in the conduct described above, Defendant violated Section 13(b)(5)

of the Exchange Act [15 U.S.C. § 78m(b)(5)] and, unless restrained and enjoined, will continue

to do so.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests a Final Judgment:

### I.

Finding that Defendant Hug violated the federal securities laws alleged in the Amended

Complaint;

### II.

Permanently enjoining Defendant Hug and all persons in active concert or participation

with him, from violating the federal securities laws alleged in this Amended Complaint;

**III.**

Ordering Defendant Hug to pay civil monetary penalties under Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)];

**IV.**

Retaining jurisdiction of this action in accordance with the principles of equity and the

Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

decrees that may be entered, or to entertain any suitable application or motion for additional

relief within the jurisdiction of this Court; and

**V.**

Granting such other and further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby demands

trial by jury.

Dated:  December 7, 2022

*/s/ Paul W. Kisslinger*

Paul W. Kisslinger
Gregory N. Miller
Assistant Chief Litigation Counsel
100 F Street, N.E.
Washington, D.C.  20549-5977
(202) 551-4427 (Kisslinger)
(202) 551-4469 (Miller)
kisslingerp@sec.gov (Kisslinger)
millergn@sec.gov (Miller)
Attorneys for Plaintiff
Securities and Exchange Commission